# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA

WESLEY NEWMAN, on behalf of himself
and others similarly situated,

      Plaintiff,

v.

DEMAYO LAW OFFICES, LLP

AND

CONVERGE MARKETING, LLC F/K/A
CONVERGE DIRECT, LLC

AND

SGMS INC. D/B/A LEGAL CONVERSION
CENTER

      Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
/

CIVIL ACTION FILE NO.
3:25-cv-00042-KDB-SCR

**FIRST AMENDED COMPLAINT –
CLASS ACTION**

**JURY TRIAL DEMANDED**

Plaintiff Wesley Newman (hereinafter referred to as "Plaintiff"), individually and on behalf of all others similarly situated, alleges on personal knowledge, investigation of his counsel, and on information and belief, as follows:

1. As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

2.     However, the TCPA doesn't only restrict robocalls.

3.     Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

4.     "The law opted for a consumer-driven process that would allow objecting individuals to prevent unwanted calls to their homes. The result of the telemarketing regulations was the national Do-Not-Call registry. *See* 47 C.F.R. § 64.1200(c)(2). Within the federal government's web of indecipherable acronyms and byzantine programs, the Do-Not-Call registry stands out as a model of clarity. It means what it says. If a person wishes to no longer receive telephone solicitations, she can add her number to the list. The TCPA then restricts the telephone solicitations that can be made to that number. *See id.*; 16 C.F.R. § 310.4(b)(iii)(B) ('It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer to . . . initiat[e] any outbound telephone call to a person when . . . [t]hat person's telephone number is on the "do-not-call" registry, maintained by the Commission.')…Private suits can seek either monetary or injunctive relief. *Id*…This private cause of action is a straightforward provision designed to achieve a straightforward result. Congress enacted the law to protect against invasions of privacy that were harming people.  The law empowers each person to protect her own personal rights. Violations of the law are clear, as is the remedy. Put simply, the TCPA affords relief to those

2

persons who, despite efforts to avoid it, have suffered an intrusion upon their domestic peace." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649-50 (4th Cir. 2019).

5.      The Plaintiff brings this action to enforce the consumer-privacy provisions of the TCPA alleging that DeMayo Law Offices, LLP ("DeMayo"), by and through its agents Converge Marketing, LLC ("New Converge") F/K/A Converge Direct, LLC ("Old Converge"), and SGMS Inc. d/b/a Legal Conversion Center, violated the TCPA by sending multiple telemarketing calls to Plaintiff and other putative class members listed on the National Do Not Call Registry without their written consent as well as sending such calls with illegal pre-recorded voices.

6.      Because the calls were transmitted using technology capable of generating thousands of similar calls per day, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who were sent the same illegal telemarketing calls.

7.      A class action is the best means of obtaining redress for the Defendant's illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## PARTIES

8.      Plaintiff Wesley Newman is an individual residing in the Northern District of Illinois.

9.      Defendant DeMayo Law Offices, LLP is a law firm that is headquartered and has its principal place of business in this District.

10.      Defendant Converge Marketing, LLC is the successor entity of Converge Direct, LLC, a lead generation and telemarketing company hired by DeMayo to generate leads on its behalf. Although DeMayo originally contracted with Lacuna Ventures, LLC, an entity that was subsequently purchased by Converge Direct, LLC (Old Converge), a New York corporation, Old

Converge filed for bankruptcy on December 7, 2023 in the case entitled In re Troika Media Group, Inc. et al. No. 23-11969 (DSJ) (S.D.N.Y.). Old Converge did not notify Plaintiff of the bankruptcy proceedings, and continued to work with Defendant DeMayo through its successor entity, Converge Marketing, LLC, a New York corporation. Both Old Converge and New Converge are referred to herein as the "Converge Entities."

11.     Defendant SGMS Inc. d/b/a Legal Conversion Center is a legal services company hired by DeMayo to call qualified legal leads on its behalf and has its headquarters and principal place of business in Texas.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

13.     This Court has general personal jurisdiction over DeMayo because it is headquartered and has its principal place of business in this District. This court has specific personal jurisdiction over the Converge Entities and LCC because they contracted with DeMayo in a contract that, among other things, and upon information and belief, had an North Carolina choice of law and forum provision and conducted the illegal telemarketing at issue on behalf of DeMayo, a North Carolina Partnership.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the calls at issue were orchestrated and designed to obtain business for a company located in this District, and therefore a substantial part of the events giving rise to the claim occurred in this District.

## BACKGROUND

The TCPA Prohibits Calls to Numbers on the National Do Not Call Registry.

15. The TCPA prohibits sending multiple telemarketing calls to a residential telephone number that has previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c)(5).

16. The National Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. *See* 47 C.F.R. § 64.1200(c)(2).

17. A listing on the National Do Not Call Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." *Id.*

18. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry and provide a private right of action against any entity that sends those solicitations, or "on whose behalf" such solicitations are sent. 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2).

The TCPA Prohibits Prerecorded Calls to Cell Phones

19. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy[.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

20. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service, specialized mobile radio service, or other

radio common carrier service, or any service for which the called party is charged for the call." 47 U.S.C. § 227(b)(1)(A).

21.    The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). *See* 47 U.S.C. § 227(b)(3).

22.    According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

23.    Congress singled out these services for special protection either because Congress realized their special importance in terms of consumer privacy and therefore protected them (as in the case of cellular phones), or because the numbers are assigned to services for which the called party is charged, thus shifting the cost of automated or prerecorded messages onto consumers. *See Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2363, (2020) (Gorsuch, J. & Thomas, J., concurring in part and dissenting in part).

24.    This cause of action applies to users of any one of the four protected services (pager, cellular, specialized mobile radio [i.e. radiotelephony locator beacons or dispatch systems], or another radio common carrier service [i.e. ship-to-shore or air-to-ground]), or any service, including residential, VoIP, and landline services, for which the called party is charged for the call. *See Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *6 (E.D. Pa. July 15, 2021).

25.    "Non-emergency prerecorded voice or autodialed calls to [the destinations enumerated in 47 U.S.C. § 227(b)(1)(A)] are permissible only with the prior express consent of

the called party." This includes calls made using artificial or prerecorded voices pitching services. *See* FCC Enforcement Advisory: Tel. Consumer Prot. Act Robocall & Text Rules - Biennial Reminder for Pol. Campaigns About Robocall & Text Abuse, 31 FCC Rcd. 1940, 1941 n.6 (2016) [hereinafter FCC Advisory].

26.     Non-consensual, non-emergency calls placed using an ATDS or an artificial or prerecorded voice violate 47 U.S.C. § 227(b)(1)(A), regardless of the purpose of the call. *Victory Phones*, 2021 WL 3007258, at *6 (rejecting claim that noncommercial survey calls were exempt and holding that "[T]he operative language of the TCPA is unambiguous. Section 227(b)(1)(A) prohibits placing artificial and prerecorded voice calls to a variety of telephone numbers."). To hold otherwise would read the words "any person" and "any call" out of the statute. *See id.*

## FACTUAL ALLEGATIONS

27.     The Plaintiff is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

28.     Plaintiff Newman's telephone number, (940) XXX-XXXX, is a non-commercial telephone number that is used for residential purposes.

29.     Plaintiff Newman uses the telephone number for his own personal, residential, and household needs and reasons.

30.     Plaintiff Newman does not use the number for business reasons or business use.

31.     The number is a residential telephone line because it is assigned to a telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses.

32.     The number is assigned to a residential cellular telephone service.

33.     Plaintiff Newman's number has been on the National Do Not Call Registry for years since he registered it on the Registry prior to receiving the calls at issue.

7

34.     Despite that, Mr. Newman received at least 12 violative calls from both Old Converge and Defendant Legal Conversion Center sent on behalf of and to generate leads and further sell DeMayo's services for Camp Lejeune legal representation claims that would be legal services provided by Defendant DeMayo.

35.     Some of these calls were placed by Old Converge with prerecorded messages. For example, during a call the Plaintiff received on November 8, 2022 at 10:39 AM Central Time, from the caller ID 940-634-4184. This call began with a robot, "Mary," an obvious robot who claimed to be with "Camp Lejeune" introduced herself and asked various questions, including if the Plaintiff or a family member was located at Camp Lejeune.

36.     Upon information and belief, this call was physically placed by another sub vendor that Old Converge hired, a company called DMS.

37.     The Plaintiff told the robot to stop calling him and to place him on the do not call list.

38.     Despite this fact, the Plaintiff continued to receive calls in the following days, including from 814-615-0698 on November 17, 2022 at 10:28 AM Central Time. This call came from a robot with a nearly identical voice, but claimed that she was "Lisa." Lisa asked the same scripted questions as "Mary," and eventually transferred the call to a human being named "Yogi Harris." "Yogi" attempted to transfer the call to Defendant DeMayo but stated that the Plaintiff's number was "blacklisted," and requested an alternative number for the Plaintiff.

39.     Upon information and belief, this call was also physically placed by another sub vendor that Old Converge hired, a company called DMS.

40.     The Plaintiff then provided another telephone number ending in -6773, which is a Voice over Internet Protocol number (VoIP number) not registered on the do not call list.

41.     Thereafter, the Plaintiff almost immediately received a call on the -6773 number from 847-201-1724 on November 17, 2024 at 10:35 AM Central Time. It was "Yogi," calling again, but the Plaintiff was then transferred to an employee of Defendant DeMayo, who answered, "Thank you for calling DeMayo Law Offices, this is Melody speaking on a recorded line." After "Melody" asked a few questions, the line disconnected.

42.     Thereafter, the Plaintiff received yet another call at 10:51 AM central time from the caller ID 484-202-7336. This was "Melody" calling again and continued to ask the Plaintiff various questions. "Melody" thereafter sent the Plaintiff the following retainer agreement naming Defendant DeMayo:

**GENERAL PERSONAL INJURY/WRONGFUL DEATH
CONTINGENT FEE CONTRACT OF REPRESENTATION**

The undersigned Client employs DeMayo Law Offices LLP (hereinafter DLAW) and any designated Co-Counsel (collectively called "the Law Firm or Firms) to represent them on the following Claim(s):

Nature of the Claim: Injuries and damages suffered as a result of exposure to toxic contaminated water at Camp LeJeune, North Carolina.

**I.     Scope of Representation:**

The Client hereby requests and authorizes DLAW and the Law Firms to represent me as my attorneys against any person(s), party, firm or corporation who might be liable for damages due to an event or an occurrence as set out specifically above.  Legal representation of the Client under this agreement is strictly limited to Personal Injury Claims or a Claim for Wrongful Death on behalf of the beneficiaries of an estate and all issues directly related to those Claims. DLAW and Co-Counsel (in any) do not represent Client in other matters unless the Client signs a separate Contract for representation on other related but separate claims (examples could include representation for Workers Compensation, Social Security Disability and/or Products Liability originating from the same event). DLAW and the Law Firms will not investigate or pursue a medical malpractice claim against any of Client's doctors or physicians.

**II.     Attorney's Fees and Costs:**

**A.     Fees – Free case evaluation, NO fees or expenses unless we recover for you**

Client agrees that the attorney's fees owed to DLAW and the Law Firms combined on my case shall be forty percent (40 %) of the

43.     These calls were placed directly from Defendant LCC to attempt to continue to sell DeMayo's representation and conduct the initial intake on DeMayo's behalf, but, to be clear, these calls were not prerecorded robocalls.

44.     That same day, the Plaintiff began researching the calls he received, which culminated in a contact through DeMayo's chat form on its website the following day, inquiring how DeMayo obtained Plaintiff's contact information.

9

45.     In the following days, the Plaintiff communicated with Gowan Moise, an attorney with Defendant DeMayo, seeking to ascertain where DeMayo obtained the Plaintiff's information.

46.     During none of these conversations did Mr. Moise reveal or state that Old Converge was responsible for the subject calls that Old Converge placed.

47.     Despite not requesting any further contact and despite requesting that the calls cease, the Plaintiff received a call on November 30, 2022 at 11:53 AM Central Time from the caller ID 940-637-1345. During this call, which started with a robot named "Steve" with "Camp Lejeune," the Plaintiff was asked the same questions by the robot as in the previous calls. The Plaintiff was then transferred to an individual who was obviously human, but who had all the unique, fictitious information the Plaintiff provided on the previous calls, and only on those calls. The Plaintiff was transferred to various humans, who all tried unsuccessfully to transfer the call to Defendant DeMayo, but were unable because the Plaintiff's number was blacklisted.

48.     Thereafter, on December 6, 2022, at 12:26 PM Central Time, the Plaintiff received a call from 940-637-1353. During this call, which started with a robot named "Steve" with "Camp Lejeune," the Plaintiff was asked the same questions by the robot as in the previous calls. This robot was the same "Steve" as the previous calls. The Plaintiff was then transferred to a human, "Sam," who asked the Plaintiff if he "knew what a litigator is." The Plaintiff responded, and then "Sam" stated "You are the litigator! You are the litigator, a******!" "Sam" then hung up the call.

49.     Upon information and belief, both of these aforementioned calls were made by Old Converge because Defendant DeMayo notified Old Converge about the illegal calls the

Plaintiff received. The foregoing statements and behavior indicate that Old Converge knowingly violates the TCPA and has evidently dealt with TCPA litigators before.

50.     The Plaintiff contacted Defendant DeMayo and Attorney Moise twice about the harassing calls, but received no response.

51.     The calls continued through December of 2022 and through May of 2023. The calls all came from various caller IDs, including 940-202-9240, 940-202-6053, 940-637-1600, 940-202-6008.

52.     These calls all began with robots and pre-recorded messages, all from a fictitious name at "Camp Lejeune," and asked the same question and scripts as the calls previously mentioned.

53.     When the Plaintiff was transferred to a human being after interacting with the robot in each occasion, the human beings already had the unique fake information the Plaintiff had provided on the previous calls, thus linking the calls all to the same source.

54.     Upon information and belief, all the aforementioned calls were placed by Old Converge.

55.     Defendant LCC was later identified as a company DeMayo hired to qualify and intake leads on its behalf and as the entity that placed some of the illegal non-prerecorded calls, which were subsequently transferred to Defendant DeMayo.

56.     Defendant DeMayo ratified LCC's and Old Converge' s conduct by accepting the multiple leads and referrals generated as a result of LCC's and Old Converge' s illegal telemarketing conduct and authorizing LCC to continue contacting the Plaintiff, including after the Plaintiff requested that the calls stop.

57.     For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

58.     In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

59.     The FCC has instructed that sellers such as DeMayo may not avoid liability by outsourcing telemarketing to agents, such as the Converge Entities and LCC, and that companies like the Converge Entities and LCC cannot avoid liability by outsourcing telemarketing services out to any additional third party call centres:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (cleaned up).

60.     In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

61.     DeMayo is liable for telemarketing calls placed by the Converge Entities and LCC and any subvendors they may have hired and which were ultimately placed with the

12

purpose and aim of and using DeMayo's name to generate customers for DeMayo, including the Plaintiff.

62.     With specific respect to the Converge Entities and the prerecorded robocalls they placed, on February 1, 2022 DeMayo originally entered into a Master Services Agreement ("Lacuna MSA") and Statement of Work with Lacuna Ventures, LLC ("Lacuna") pursuant to which Lacuna was to provide media and marketing services to DeMayo.

63.     On March 22, 2022, Troika Media Group, Inc. ("Troika") acquired Old Converge. Troika also owned Lacuna.

64.     Thus, during all times relevant, and at the times of the first calls complained of in November of 2022, Defendant DeMayo was effectively working with Old Converge, as the companies had merged.

65.     Then, on December 7, 2023, Old Converge filed for bankruptcy in the case entitled *In re Troika Media Group, Inc. et al.*, No. 23-11969 (DSJ) (S.D.N.Y.) (the "Bankruptcy Proceeding").

66.     Despite knowing of Mr. Newman's claims in May of 2023 via correspondences between various individuals at DeMayo and Old Converge, Old Converge did not notify Mr. Newman of the Bankruptcy Proceeding, nor list him as a creditor on its schedules.

67.     Indeed, during May of 2023, Old Converge promised to indemnify DeMayo and stated "We will all be indemnified. . .," but when asked to provide proof that Old Converge was authorized to contact Plaintiff, stated that "the sub partner who is responsible for this cannot claim a trusted form."

68.     In so doing, DeMayo further knew that Old Converge was hiring sub partners to physically place the calls, which it would then turn around and sell as leads to DeMayo pursuant to the parties' agreement.

69.     DeMayo uses telemarketing and lead generation companies like the Converge Entities and LCC who it authorizes to make to phone calls to potential customers, vet potential clients, and then send DeMayo only the interested ones.

70.     DeMayo controlled the day-to-day activities of the Converge Entities and LCC by allowing them to work up the beginning of client intake on its behalf and then only speak with interested, pre-qualified customers that met criteria set by DeMayo.

71.     DeMayo also could have prohibited the Converge Entities and LCC and their subcontractors from using leads generated to numbers on its internal Do Not Call list, let alone calls placed to numbers on the Do Not Call Registry and using highly-illegal prerecorded messages placed by Old Converge.

72.     They did not.

73.     Finally, DeMayo could have terminated the Converge Entities and LCC once they learned of their illegal marketing conduct.

74.     They did not. In fact, the Converge Entities used the Plaintiff's complaint to continue to harass the Plaintiff.

75.     A reasonable seller like DeMayo or a reasonable marketing company like the Converge Entities and LCC would investigate why its agents were using illegal outbound telemarketing calls to sell its products to numbers which should have been on both its internal Do Not Call lists and the National Do Not Call list, as well as using highly-illegal prerecorded calls, as well as harassing those who had asked them to stop.

14

76.     Moreover, a reasonable seller would also investigate into the reasons why their agents would be calling numbers to numbers on the Do Not Call Registry with highly illegal prerecorded messages.

77.     They did not.

78.     DeMayo hired the Converge Entities and LCC without a proper investigation, and did not terminate them when they were informed of the Converge Entities and LCC's illegal calling conduct.

79.     As such, DeMayo knowingly ratified the Converge Entities and LCC's conduct.

80.     The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

81.     New Converge is liable for the actions of Old Converge on a theory of successor liability.

82.     First, prior to the Bankruptcy Proceeding, Old Converge was in communication with and promised to indemnify DeMayo with respect to Mr. Newman's claim and coordinated response letters and the provision of counsel both to Mr. Newman's investigative correspondences to DeMayo and a Better Business Bureau (BBB) complaint against DeMayo.

83.     Despite this involvement, none of these responses or correspondences revealed the involvement of Old Converge, let alone the identities of the "sub partner" of Converge, DMS, which Converge hired to physically place the calls.

15

84.     Although a Section 363(f) sale typically extinguishes any successor liability claims that Plaintiff may have as against New Converge, the Plaintiff received *no notice* of Old Converge's bankruptcy, and was not even on inquiry notice of the same, as he had no knowledge of Old Converge's involvement in the litigation when he filed the instant suit on January 21, 2025, long after the 363(f) sale had concluded and New Converge spun up as the successor entity. As a result, Mr. Newman's, and the Class's, claims were not discharged through the sale. *In re J.A. Jones, Inc.*, 492 F.3d 242, 249 (4th Cir. 2007) ("[T]o achieve a constitutionally permissible discharge of a known creditor's claim against a debtor, actual notice of the bankruptcy filing and applicable bar date is required.").

85.     It is well established that Old Converge should have provided actual written notice to Mr. Newman (and the putative Class) as a known potential creditor with claims against the bankrupt estate, by virtue of the May 2023 correspondences and complaint, but did not. *See id.* (holding known creditors have a right to actual, written notice of a bankruptcy proceeding); *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 315, (1950) ("When notice is a person's due, process which is a mere gesture is not due process."); *Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995) (same).

86.     Mr. Newman was a known creditor of Old Converge because Old Converge was actually aware of Mr. Newman's prepetition claims and in communication to attempt to resolve them with both DeMayo and LCC throughout May of 2023.

87.     Old Converge then strategically chose to respond to Mr. Newman's allegations through a joint response through counsel to hide its involvement to Mr. Newman.

88.     A known creditor, like Mr. Newman, is one whose identity is actually known to the debtor, as well as one whose identity is "reasonably ascertainable" to the debtor through

16

"reasonably diligent efforts" *In re J.A. Jones, Inc.*, 492 F.3d at 250. More specifically, "a known creditor or claim arises from facts that would alert a reasonable debtor, based on a careful examination of its own books and records, to the possibility that a claim might reasonably be filed against it by a particular individual or entity," precisely as occurred here. *Id.*

89.     Indeed, in correspondences between DeMayo and Old Converge that were sent *after* the joint responses were sent to Plaintiff and the BBB, Old Converge acknowledged that potential settlement appeared to be off the table because the response "fanned the flames with this guy and is pushing back."

90.     Nor did Mr. Newman have constructive notice through publication, even assuming, *arguendo*, he was an unknown creditor (which he was not), because he had no clue of New Converge's substantial involvement in the calling conduct at issue, not even at the time he filed his original Complaint.

91.     As a result of the lack of notice, Plaintiff's, and the Class's claims against Old Converge were not discharged even as a result of Old Converge's bankruptcy and continue against New Converge as a successor. *In re Savage Indus., Inc.*, 43 F.3d 714, 723 (1st Cir. 1994).

92.     Plaintiff never consented to receive calls from Defendants.

93.     In fact, as described above, the Plaintiff explicitly revoked any purported consent to receive calls from the Defendants, but the calls continued.

94.     The calls were all placed to sell Defendant DeMayo's goods and services, including legal services.

95.     Plaintiff's privacy has been violated by the above-described telemarketing calls.

96.     The Plaintiff never provided his consent or requested the calls.

97.     The aforementioned calls to the Plaintiff were unwanted.

98.     The calls were non-consensual encounters.

99.     The Defendants had the ability to immediately honor Plaintiff's do not call requests, but they did not. Instead, they continued to harass the Plaintiff for daring to make such a request.

100.    Plaintiff and all members of the Classes, defined below, have been harmed by the acts of Defendants because their privacy has been violated and they were annoyed and harassed. In addition, the calls occupied their telephone lines, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

## CLASS ACTION ALLEGATIONS

101.    Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

102.    Plaintiff brings this action on behalf of herself and the following classes (the "Classes") pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

103.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

> **Converge Robocall Class**: Plaintiff and all persons within the United States: (1) to whose cellular telephone numbers (2) the Converge Entities, or a third party on their behalf, placed a call using artificial or pre-record messages (3) within the four years prior to the filing of the Complaint.

>> **DeMayo Robocall Sub-Class:** Plaintiff and all persons within the United States: (1) to whose cellular telephone numbers (2) the Converge Entities, or a third party on their behalf, placed a call using artificial or pre-record messages (3) that advertised, or were intended to advertise, DeMayo's goods and/or services (4) within the four years prior to the filing of the Complaint.

> **National Do Not Call Registry Class:** All persons within the United States: (1) whose telephone numbers were on the National Do Not Call Registry for at least 31 days; (2) but who received more than one telephone solicitation call from Defendants or a third party

18

acting on Defendants' behalf; (3) within a 12-month period; and (4) within the four years prior to the filing of the Complaint.

**<u>Internal Do Not Call Class</u>:** All persons within the United States to whom: (1) Defendants (or a third-party acting on behalf of Defendants) sent (2) two or more telemarketing calls in a 12-month period, (3) who were not current customers of the Defendants at the time of the calls, (4) who had previously asked for the calls to stop and (5) within the four years prior to the filing of the Complaint.

104. Plaintiff is a member of and will fairly and adequately represent and protect the interests of the classes.

105. Excluded from the Classes are counsel, Defendants, and any entities in which Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

106. Plaintiff and all members of the Classes have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, the use of their telephone power and network bandwidth, and the intrusion on their telephone that cluttered legitimate communications.

107. This Class Action Complaint seeks injunctive relief and money damages.

108. The Classes, as defined above, are identifiable through Defendants' dialer records, other phone records, and phone number databases.

109. Plaintiff does not know the exact number of members in the Classes, but Plaintiff reasonably believes Class members number, at minimum, in the hundreds as the calls were sent in a generic fashion.

110. The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

111. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

19

112.    There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

113.    There are numerous questions of law and fact common to Plaintiff and to the proposed Classes, including, but not limited to, the following:

      a.   Whether Defendants sent multiple calls to Plaintiff and members of the National Do Not Call Registry Class;

      b.   whether Defendants made calls using artificial or prerecorded voices to Plaintiff and members of the Robocall Class and Sub-Class;

      c.   whether Defendants recorded or honored "do not call" requests of Plaintiff and members of the Internal Do Not Call Class;

      d.   Whether Defendants' conduct constitutes a violation of the TCPA;

      e.   Whether Plaintiff and the Class had adequate notice of Old Converge's bankruptcy;

      f.   Whether New Converge is liable for the actions of Old Converge; and

      g.   Whether members of the Classes are entitled to treble damages based on the willfulness of Defendants' conduct.

114.    Further, Plaintiff will fairly and adequately represent and protect the interests of the Classes because the Plaintiff has no interests which are antagonistic to any member of the Classes.

115.    Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiff and her counsel are

committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so.

116.    Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class members, which will be ascertainable from records maintained by Defendants and/or their agents.

117.    The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

## **FIRST CAUSE OF ACTION**

### **Statutory Violations of the Telephone Consumer Protection Act (47 U.S.C. § 227(b)) on behalf of the Robocall Class**

118.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

119.    The Defendants violated the TCPA by sending or causing to be sent calls to the cellular telephones and other protected telephones of Plaintiff and members of the Robocall Class using a pre-recorded messages without their prior express written consent.

120.    As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Robocall Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B).

121.    The Plaintiff and Robocall Class members are entitled to an award of treble damages if the Defendants' actions are found to have been knowing or willful.

122.     Plaintiff and Robocall Class members are also entitled to and do seek injunctive relief prohibiting Defendants from using a pre-recorded voice in the future, except for emergency purposes.

## SECOND CAUSE OF ACTION

**Violation of the Telephone Consumer Protection Act**
**(47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(c) on behalf of Plaintiff and the National Do Not Call Registry Class)**

123.     Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

124.     The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by sending telemarketing calls, except for emergency purposes, to Plaintiff and members of the National Do Not Call Registry Class despite their numbers being on the National Do Not Call Registry.

125.     Defendants' violations were negligent, willful, or knowing.

126.     As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the National Do Not Call Registry Class are entitled to an award of up to $500 in damages for each and every call sent and up to $1,500 in damages if the calls are found to be willful.

127.     Plaintiff and the members of the National Do Not Call Registry Class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from sending telemarketing calls,

including calls, to telephone numbers registered on the National Do Not Call Registry, except for emergency purposes, in the future.

## **THIRD CAUSE OF ACTION**

### **Violation of the Telephone Consumer Protection Act**
### **(47 U.S.C. § 227(c)(5) & 47 C.F.R. § 64.1200(d) on behalf of Plaintiff and the Internal Do Not Call Registry Class)**

128.     Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

129.     The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by sending telemarketing calls, except for emergency purposes, to Plaintiff and members of the Internal Do Not Call Class despite previously requesting that such calls stop.

130.     Defendants' violations were negligent, willful, or knowing.

131.     As a result of Defendants' and/or its affiliates, agents, and/or other persons or entities acting on Defendants' behalf, violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the Internal Do Not Call Class are entitled to an award of up to $500 and in damages for each and every call sent and up to $1,500 in damages if the calls are found to be willful

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

A.     Injunctive relief prohibiting Defendants from sending calls or calls soliciting the purchase of its goods or services, except for emergency purposes, to any residential number on the National Do Not Call Registry in the future;

B. Injunctive relief prohibiting Defendants from calling telephone numbers who had previously asked not to be called except for emergency purposes, in the future;

C. Injunctive relief prohibiting Defendants from using artificial or pre-recorded voices to contact cell phones and other protected lines, except for emergency purposes, in the future;

D. That the Court enter a judgment awarding Plaintiff and all Class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation; and

E. An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing Classes the Court deems appropriate, finding that Plaintiff is a proper representative of the Classes, and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes;

F. Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated: February 27, 2026

*/s/ Anthony I. Paronich*
Anthony I. Paronich
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(617) 485-0018
anthony@paronichlaw.com
*Notice of Special Appearance*

*/s/ Ryan Duffy*
Ryan Duffy
The Law Office of Ryan P. Duffy, PLLC
1213 W. Morehead Street
Suit 500, Unit #450
Charlotte, North Carolina 28208
ryan@ryanpduffy.com

24

Telephone: (704) 741-9399