# Exhibit 2



## MASTER SERVICES AGREEMENT

This MASTER SERVICES AGREEMENT ("Agreement") is made and effective as of **February 1, 2022** (the "Effective Date"), by and between Lacuna Ventures, LLC, a New York corporation with its principal office located at 2 Depot Plaza, Suite 402, Bedford Hills, New York 10507 ("Company"), and **DeMayo Law Offices, L.L.P**, a limited liability company whose Registered Address is at 1211 E Morehead St, Charlotte, NC 28204 ("Client"). Client includes its parent companies, subsidiaries, affiliates and related parties. Client and Company are collectively referred to herein as the "Parties" and each may be individually referred to herein as a "Party".

For, and in consideration of the mutual promises and agreements contained herein, the Parties intending to be legally bound hereby agree as follows:

**Section 1. Engagement.** Client engages Company to perform marketing and related services in connection with this Agreement ("Services") as specified in one or more Statements of Work signed by an authorized representative of Client and Company ("Statement of Work"). Each Statement of Work ("SOW") will set forth a detailed description of the Services to be performed in addition to deliverables, fees, billing and other relevant operational and commercial terms. Each Statement of Work will form part of this Agreement. In the event of any conflict between any term of this Agreement and any SOW, the Agreement will control. Company is solely responsible for determining the method, details, means and manner for performing the Services, provided that the Services are completed as specified in a Statement of Work. Changes within the scope of the Services, as identified in each Statement of Work, will be made only in writing and agreed upon by the Parties in writing.

**Section 2. Term.** The term of this Agreement will commence on the Effective Date and continue for a minimum period of one (1) year, unless terminated earlier pursuant to the terms of this Agreement in Section 11 ("Initial Term"). This Agreement shall automatically renew for successive one (1) year terms.

**Section 3. Fees, Expenses and Taxes.** Fees shall be set in a SOW and can vary subject to the Services and fee models made available by Company from time to time. Client hereby appoints Company as its agent and authorizes Company to act on its behalf solely in connection with the Services listed in the respective Statements of Work only. Each Party will be responsible for paying all taxes and duties properly assessed on it by governmental or regulatory authorities having jurisdiction over such Party's activities. Client shall be responsible for all regulatory taxes for services or products that are purchased by Company on their behalf with no qualifications.

## Section 4. Representations and Warranties; Additional Covenants.

(a) Each Party represents and warrants to the other Party that (i) it has the full right, power and authority to enter into this Agreement and perform its obligations hereunder; (ii) this Agreement has been duly authorized by such Party; (iii) this Agreement is valid and binding upon such Party and enforceable against such Party in accordance with its terms; (iv) its execution, delivery and performance of this Agreement does not and will not (A) conflict with, or cause a breach of, any other agreements or obligations to which it is a party or by which it is bound or (B) violate with any applicable laws, rules or regulations; and (v) it has received all applicable government and regulatory authorizations, licenses or other approvals necessary to enter into, and perform its obligations under, this Agreement.

(b) Each Party hereby agrees to comply with all applicable foreign, federal, state and local laws, rules and regulations in connection with the performance of its rights, duties and obligations under this Agreement.

(c) Each Party agrees to maintain all necessary licenses, permits or approvals required to be maintained by it or any of its employees or subcontractors permitting or authorizing them to perform its obligations under this Agreement in each and every

Case 3:25-cv-00042-KDB-DCK    Document 60-2    Filed 05/15/26    Page 2 of 10

jurisdiction having authority over such Party or over the performance of such obligations.

(d)     Client agrees that Company is not liable for the acts and omissions of any subcontractor or vendor that it utilizes to perform the Services or any of its other obligations under this Agreement or any SOW.

(e)     Company represents and warrants to Client that all Company personnel, including any independent contractors, assigned to perform Company's obligations under this Agreement have the proper skill, training and background to perform in a competent and professional manner all of Company's obligations hereunder.

(f)     Each Party represents, warrants and agrees to and with the other Party that such Party's Marks and all content provided by such Party or its affiliates to the other Party to be used in connection with such other Party for use in connection with its performance under this Agreement do not, and will not, violate any copyright, trade secret, trademark, patent, invention, privacy or non-disclosure rights (collectively, "Intellectual Property Rights") of any third party. Each Party represents and warrants to the other Party that it owns or has sufficient rights in and to all of its Marks to grant to the other Party the license described in this Section above.

(g)     Client agrees that it is solely and entirely responsible for any and all liability arising out of or in connection with the content, form and specifications of any Client branded: advertisements, marketing content, marketing materials, marketing eco-systems (web/mobile pages and applications, etc) to include, but not be limited to, creative, content, offers, copy, consumer restrictions and product/service availability, legal and compliance requirements. Client's approval (whether on a case-by-case basis or based on Client approved standards) are required. Client represents and warrants to Company that no part of any unaltered advertisement provided by Client will (a) infringe on any third party's copyright, patent, trademark, trade secret or other proprietary rights or right of publicity or privacy; or (b) violate any applicable law, statute, ordinance or regulation, including, without limitation, laws and regulations governing export control, false advertising or unfair competition. As between Client and Company, Company agrees that it is solely responsible for any liability arising from any acts or omissions by or on behalf of Company relating to the actual publishing of any advertisement not supplied or approved by Client.

(h)     In the event that Company is providing

leads, consumer traffic or similar services (of any nature or form) to Client, Client shall notify Company in writing of any issues concerning the validity or acceptability of any such leads within seventy-two (72) hours of lead transmission by Company.

(i)     In the event that Client identifies any potential fraud or errors in any marketing leads, cases or consumer traffic (or any part of the Services in an SOW) provided by Company and that Company can be reasonably deemed to have direct control over or that it should have been able to prevent with due to regard for the source or activity that it utilized in generating a fraudulent lead, Client shall promptly, pursuant to Section 14 provide reasonable and necessary supporting information for Company to review. In the event that Services or part thereof are deemed to be fraudulent or erroneous, as determined by Company, at its sole and absolute discretion, the exclusive obligation upon Company shall be to provide a credit for an amount that Company determines to be appropriate at its sole and absolute judgement and as reasonably exercised, is appropriate and strictly subject to notification requirements by Client pursuant to this Agreement. Company tracking system shall be the only tracking system used to determine the payable leads or Services.

### Section 5.   Ownership of Work Product; Licensed Marks.

(a)     All work product listed in any Statement of Work as a Deliverable will belong to Client. Any processes, systems, code, databases, platforms know how and Intellectual Property (including enhancements and alterations), campaign structures, formulations and development, ad server level account structures and methodology, algorithms, statistical models, forecast models and other related know how whatsoever, that is proprietary in nature, and may have been developed by Company during the Agreement for the benefit of the Company and not specifically for Client will belong to Company, subject to the remaining provisions of this Section. Notwithstanding the foregoing, Client agrees that Company, its employees and agents will be free to use and employ their general skills, know-how, and expertise, and to use, disclose, and employ any generalized ideas, concepts, know-how, methods, techniques or skills gained or learned during the course of performing any of the Services, subject to Company's obligations under this Agreement respecting Client's Confidential Information (as defined below). Each Party will retain all right, title and interest in, to any and all methodologies, including, without limitation, software and related documentation, utilities, urls, trademarks, web and mobile operations, creative, tools, ideas, know-

Case 3:25-cv-00042-KDB-DCK    Document 60-2    Filed 05/15/26    Page 3 of 10

how, techniques and concepts that are owned or licensed by such Party and used by it in the performance of this Agreement, and any inventions, improvements, additions, enhancements or modifications to any of the foregoing, that are developed, acquired or first conceived or reduced to practice by such Party or any third party on behalf of such Party prior to the execution of this Agreement.

(b) Client hereby grants to Company a non-exclusive, non-transferable, non-sub-licensable license to use the logo, trademarks or trade names of the Client (the "Company Marks") solely in connection with its performance of its rights and obligations under this Agreement or any SOW.

## Section 6. Confidentiality.

(a) During the course of performance of this Agreement by the Parties, a disclosing Party (the "Disclosing Party") may disclose to the other Party (the "Receiving Party") certain trade secrets, training material, telephone scripts, methodology, customer and supplier lists, processes, documentation, marketing and development plans, data, know-how, business strategies, information concerning the operations, affairs and businesses of the Disclosing Party or its affiliates, the financial affairs of the Disclosing Party or its affiliates, and the relations of the Disclosing Party or its affiliates with its or their employees and service providers and other confidential and proprietary information not generally known to the public (including, without limitation, the terms of this Agreement) owned or used by the Disclosing Party (all such materials, whether or not in writing or specifically designated as proprietary or confidential, collectively and individually hereinafter referred to as "Confidential Information"); provided, however, that "Confidential Information" does not include any data or information that:

(i) Is now or subsequently becomes generally available to the public through no fault or breach of confidentiality obligations on the part of the Receiving Party;

(ii) The Receiving Party can demonstrate to have had rightfully in its possession prior to disclosure to the Receiving Party by the Disclosing Party;

(iii) Is independently developed by the Receiving Party without the use of any of the Disclosing Party's Confidential Information; or

(iv) The Receiving Party rightfully obtains on a non-confidential basis from a third party who has the right to transfer or disclose it.

(b) The Receiving Party agrees that, for the purposes of this Agreement, all Confidential Information it receives from or on behalf of the Disclosing Party in connection with this Agreement constitutes confidential, proprietary information of the Disclosing Party. The Receiving Party agrees that, for the purposes of this Agreement, the Confidential Information of the Disclosing Party is the property of the Disclosing Party (or of third parties that have provided such Confidential Information to the Disclosing Party for use by the Disclosing Party) and that the Receiving Party will, and will cause its directors, officers, managers, members, employees, agents and contractors to, hold such Confidential Information in a confidential fashion and the Receiving Party will use the same degree of care (by instruction, agreement or otherwise) to maintain the confidentiality of such Confidential Information that the Receiving Party uses to maintain the confidentiality of its own Confidential Information (and, at a minimum, at least a commercially reasonable degree of care). If requested by the Disclosing Party, all Confidential Information of the Disclosing Party will either be returned to the Disclosing Party or destroyed, at the option of the Receiving Party, at the end of the Term (or earlier upon the Disclosing Party's written request). The Receiving Party further agrees that it will use the Confidential Information of the Disclosing Party only as required to perform its obligations under this Agreement. The Receiving Party further agrees that it will limit the dissemination of the Confidential Information of the Disclosing Party within its own organization to such individuals whose duties justify their need to know such information, and then only provided that there is a clear understanding by such individuals of their need to maintain the confidential and proprietary nature of such Confidential Information and to restrict its uses to the purposes specified in this Agreement.

(c) In the event the Receiving Party becomes legally compelled (by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand or similar legal process) to disclose any of the Confidential Information of the Disclosing Party or take any other action with respect thereto prohibited by this Section, the Receiving Party will provide the Disclosing Party with prompt written notice, if permitted by applicable law, so that the Disclosing Party may seek a protective order or other appropriate remedy with respect to such disclosure. In the event that such protective order or other remedy is not obtained, the Receiving Party will furnish only that

portion of such Confidential Information or take only such action that is legally required and, if reasonably requested by the Disclosing Party, will exercise commercially reasonable efforts to obtain reliable assurance that confidential treatment will be accorded any such Confidential Information so furnished at the Disclosing Party's expense. Breach or threatened breach of the confidentiality obligations set forth in this Section may have no adequate remedy in damages and may cause irreparable damage to the Disclosing Party and, therefore, the Disclosing Party will have the right to seek equitable and injunctive relief without the need to post a bond or other security, and to recover the amount of damages (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection with such breach or threatened breach, in addition to any other rights it may have in law or equity.

(d) The terms of this Section will be effective during the Term and for a period of one (1) year after the end of the Term.

**Section 7. Contractual Relationship.** In the performance of this Agreement, each Party is acting independently and is not an agent or representative of the other Party.

**Section 8. Limitations on Warranties.** EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, EACH PARTY DISCLAIMS ALL WARRANTIES, EXPRESS AND IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NO ORAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY PARTY OR ITS AUTHORIZED REPRESENTATIVES WILL CREATE A WARRANTY OR IN ANY WAY INCREASE THE SCOPE OF THE WARRANTIES GIVEN TO THE OTHER PARTY IN THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THE LIMITATIONS ON WARRANTIES AS SET FORTH IN THIS SECTION ARE A MATERIAL INDUCEMENT TO THE OTHER PARTY TO ENTER INTO THIS AGREEMENT AND THAT THE PRICES AGREED TO BE PAID BY CLIENT FOR SERVICES REFLECT THESE LIMITATIONS ON WARRANTIES.

**Section 9. Limitations on Liability.** IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR SPECIAL, EXEMPLARY, PUNITIVE, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST REVENUES, PROFITS, SAVINGS OR BUSINESS) OR LOSS OF RECORDS OR DATA, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAS BEEN DISCLOSED TO SUCH PARTY IN ADVANCE OR COULD HAVE BEEN REASONABLY FORESEEN BY SUCH PARTY, AND WHETHER IN AN ACTION BASED ON CONTRACT, WARRANTY, STRICT LIABILITY, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE. EXCEPT IN THE CASE OF THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH PARTY, A PARTY'S LIABILITY TO THE OTHER PARTY FOR ANY CLAIM, LOSS OR OTHER LIABILITY ARISING OUT OF, OR CONNECTION WITH THIS AGREEMENT, THE SERVICES CONTEMPLATED HEREUNDER OR CLIENT'S USE OF ANY SERVICES OR DELIVERABLES OF COMPANY, AND WHETHER BASED UPON CONTRACT, WARRANTY, STRICT LIABILITY, TORT (INCLUDING, WITHOUT LIMITATION, NEGLIGENCE), OR OTHERWISE, WILL IN NO CASE EXCEED THE AGGREGATE AMOUNTS PAID TO COMPANY BY CLIENT UNDER THIS AGREEMENT. NOTWITHSTANDING ANYTHING IN THIS SECTION TO THE CONTRARY, THIS SECTION DOES NOT LIMIT EITHER PARTY'S INDEMNIFICATION OBLIGATIONS UNDER THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT THE LIMITATIONS ON LIABILITIES AS SET FORTH IN THIS SECTION ARE A MATERIAL INDUCEMENT TO SUCH PARTY TO ENTER INTO THIS AGREEMENT AND THAT THE PRICES AGREED TO BE PAID BY CLIENT FOR SERVICES REFLECT THESE LIMITATIONS ON LIABILITY.

**Section 10. Indemnification.** Each Party (the "Indemnifying Party") agrees to indemnify, defend and hold harmless the other Party and its affiliates and their respective members, managers, officers, directors, employees, agents, representatives and permitted successors and assigns (collectively, the "Indemnified Party") against and from all losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and costs and expenses), attributable to any third-party claim, proceeding, action, lawsuit or investigation (a "Claim") related to or arising out of (i) any breach by the Indemnifying Party of any representation, warranty or covenant of the Indemnifying Party contained in this Agreement; (ii) the negligence or willful misconduct by or on behalf of the Indemnifying Party in connection with the performance or lack of performance of the Indemnifying Party's rights or obligations under this Agreement; or (iii) the Indemnifying Party's infringement of any third-party Intellectual Property Right.

Case 3:25-cv-00042-KDB-DCK    Document 60-2    Filed 05/15/26    Page 5 of 10

(a)     The conditions for the indemnity set forth in paragraph (a) above are that (i) the Indemnified Party must notify the Indemnifying Party in writing promptly upon notice of the Claim; provided, however, that the failure to provide such notice will not relieve the Indemnifying Party of its indemnification obligations to such Indemnified Party unless the failure to provide such notice unduly prejudices the Indemnifying Party's ability to defend the Indemnified Party); (ii) the Indemnifying Party will be permitted, through counsel mutually acceptable to the Indemnified Party and the Indemnifying Party (such acceptance not to be unreasonably withheld, conditioned or delayed), to answer and defend such Claim; and (iii) the Indemnified Party will provide the Indemnifying Party information and reasonable assistance, at the Indemnifying Party's expense, to help the Indemnifying Party to defend such Claim.

(b)     The Indemnifying Party may, upon written notice of any Claim to the Indemnified Party, undertake to conduct all proceedings or negotiations in connection therewith, assume the defense thereof, and if it so undertakes, it also will undertake all other required steps or proceedings to settle or defend such Claims, including, without limitation, the employment of counsel which must be reasonably satisfactory to the Indemnified Party, and payment of all expenses. The Indemnified Party will have the right to employ separate counsel and participate in the defense of any claims at the Indemnified Party's expense. The Indemnifying Party must reimburse the Indemnified Party upon demand for any payments made or loss suffered by it at any time after the date hereof, based upon the judgment of any court of competent jurisdiction or pursuant to a bona fide compromise or settlement of claims in respect to any damages related to any Claim under this Section. The Indemnifying Party may not settle any Claim under this Section on the Indemnified Party's behalf without first obtaining the Indemnified Party's written permission, which permission will not be unreasonably withheld, conditioned or delayed. In the event that the Indemnifying Party and the Indemnified Party agree to settle a Claim, each such Party agrees not to publicize the settlement without first obtaining the other Party's written permission.

### Section 11.     Termination.

(a)     Each Party has the right to terminate this Agreement by providing the other Party with a minimum written notice of at one hundred and twenty (120) calendar days; provided that no such termination will be effective unless all SOWs have been terminated in accordance with their terms prior to or contemporaneously with such termination of this Agreement. Each Statement of Work will terminate and will be terminable in accordance with its own terms.

(b)     Either Party has the right to terminate this Agreement, including, without limitation, all SOWs, upon the failure by the other Party to remedy a material breach of this Agreement within thirty (30) calendar days after receiving written notice of such breach from the such Party; provided, however, that such Party will not have the right to so terminate this Agreement pursuant to this paragraph (b) due to such breach if the other Party cures such breach within such thirty (30) day period.

(c)     Notwithstanding anything in this Agreement to the contrary, if either Party files a petition for bankruptcy, makes a general assignment for the benefit of creditors, suspends the operations of a substantial portion of its business, or if a receiver is appointed on account of insolvency, then the other Party will have the right, if permitted by applicable law, to terminate this Agreement, including, without limitation, all SOWs, upon written notice to such Party.

(d)     Upon the termination of this Agreement, subject to Section 11(e) below, all rights and licenses granted by each Party to the other Party hereunder will immediately cease.

(e)     Notwithstanding the expiration or other termination of this Agreement for any reason, all provisions of this Agreement which by their nature must survive termination or expiration of this Agreement to give effect thereto.

(f)     Notwithstanding anything in this Agreement to the contrary, Company will provide Client with a final invoice for Services rendered by Company under this Agreement within ninety (90) calendar days of the completion of the last Service performed and Client will pay the invoice within thirty (30) calendar days after its receipt thereof (subject to Client's right to verify the Services performed and the costs associated with them) unless expedited payment is necessary.

(g)     The termination of this Agreement will not limit either Party from pursuing other remedies available to it, including, without limitation, injunctive relief (if available). The remedies stated in this Section are in addition to all other remedies available to the Parties under applicable Law or otherwise, as limited by this Agreement.

Case 3:25-cv-00042-KDB-DCK     Document 60-2     Filed 05/15/26     Page 6 of 10

**Section 12.    Insurance.** During the Term, Company will maintain at its expense commercially reasonable insurance coverage for itself and its employees. Each such insurance coverage shall, at all times, be insured with an insurance company that has a Best's Rating of A- or higher.

**Section 13.    Force Majeure.** Neither Party will be responsible for any failure to perform its obligations under this Agreement, other than obligations to pay money, if caused by an event reasonably beyond its control, including, without limitation, wars, riots, labor strikes, acts of terrorism, natural disasters, or any law, regulation, ordinance, or other act or order of any court, government, or governmental agency. Obligations hereunder, however, will in no event be excused but may be suspended only until the cessation of any cause of such failure. If such force majeure should obstruct performance of this Agreement for more than thirty (30) days, the Parties must consult with each other to determine whether this Agreement should be modified or terminated. A Party experiencing an event of force majeure must notify the other Party as soon as possible after its occurrence.

**Section 14.    Records; Audit.** During the Term and for a period of one (1) year after the end thereof, Client shall provide to Company all relevant data required to (a) calculate and verify the Fees and compensation payable to Company (b) other data that will assist Company to optimize its marketing strategies and media buying. Company shall notify Client of the data that is required, cadence of delivery and format. Company shall all times ensure that the data is accurate and complete and is provided within the timeframes required by Company. Further details of the data points and cadence shall be set out in the respective SOWs. Company has the right to inspect and audit the underlying data, databases, systems, platforms and sources that were used to compile the aggregated data supplied to Company by Client. Company has the right to tender supplemental invoices to reflect changes in the data that is supplied by Client. Payment terms of additional invoices shall be in line with the payment terms of the Fees as set out in the respective SOW. Company may, at its sole and absolute discretion, charge Client additional charges in respect of Fees that were not accurately conveyed by Client through the data supplied. Client shall promptly (and no later than three days of a particular lead, case or Service being provided to Client by Company) notify Company of any issues as to fraud, potential fraud, quality or accuracy of the Services (including errors or omissions) in any aspect of the Services and provide Company access to records to support the same.

**Section 15.    Relationship of the Parties.** Company shall be an "independent contractor" for all purposes under this Agreement. Neither Party, nor any of its employees or other agents, shall be deemed to be an "employee," "agent," "servant," or "joint employee" of the other party. Neither Party will have control or influence over any of the other Party's employees or other agents. In that regard, each Party hereto shall have the sole discretion to hire and fire, discipline, evaluate, manage, train, maintain records of hours, handle payroll, provide insurance, and determine all other terms and conditions of employment for its employees. Employees and other agents of each Party will not be eligible to participate in any of the other Party's employee or fringe benefit programs, including, but not limited to, any bonus, pension, profit sharing, stock option, vacation, disability, retirement, deferred compensation, or insurance which such other party may maintain for its own employees. Each Party and its directors, officers, employees and agents may not represent that they are employees or agents of the other Party, nor may they in any manner hold themselves out to be employees or agents of the other Party.

**Section 16.    Entire Agreement; Amendment; Captions.** This Agreement, and any SOWs entered into in connection with this Agreement, contains the entire agreement of the Parties with respect to the subject matter hereof and supersedes all previous agreements and understandings between the Parties with respect to such subject matter. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter of this Agreement have been made by either Party which are not set forth expressly in this Agreement. This Agreement may be amended, supplemented or otherwise modified only upon written agreement by the Parties. The captions of this Agreement are solely for reference and have no legal effect whatsoever and will not in any way affect the interpretation or construction of this Agreement.

**Section 17.    Assignment.** Neither Party may assign any of its rights or delegate any of its obligations under this Agreement without the other Party's prior written consent. Any attempted assignment or delegation by a Party in violation of this Agreement will be null and void. Notwithstanding the foregoing, (a) either Party may assign any of its rights or delegate any of its obligations under this Agreement to any of its affiliates and (b) either Party may assign this Agreement in connection with a sale of all or substantially all of its assets or a stock sale, merger or other corporate reorganization resulting in a change of control of such Party, in each case without the consent of the other Party. Notwithstanding anything in this Section to the

contrary, this Agreement will be valid and binding on each Party's successors and assigns.

**Section 18.     Waivers.** Except as otherwise expressly provided herein, no waiver or purported waiver by any Party of any breach by the other Party of its obligations, representations, warranties, covenants or other agreements under this Agreement will be effective unless made in writing by such Party. No failure by a Party to pursue or elect any remedy with respect to any default under, or breach of, any provision of this Agreement by the other Party will be deemed to be a waiver of any subsequent, similar or different default or breach by such other Party.

**Section 19.     Notices.**     All notices or other communications required or permitted to be given under this Agreement by a Party, including, without limitation, any notice of a change of address, must be in writing and will be deemed validly delivered (as elected by the Party giving such notice) if (a) delivered personally; (b) sent by overnight express delivery service; (c) sent by registered or certified mail, postage prepaid, return receipt requested; or (d) sent by confirmed facsimile, in each case at or to the address or fax number, as the case may be, set forth on the signature page hereof. Except as otherwise specified herein, all notices and other communications delivered under this Section will be deemed to have been delivered to a Party on (w) the date of its receipt, if delivered personally; (x) the date that is one (1) business day after the date sent by overnight express delivery services; (y) the date that is five (5) days after posting, if transmitted by U.S. mail; or (z) the date of confirmation receipt if faxed. Any Party may change its address for purposes of this Section by providing written notice thereof to the other Party in accordance with this Section.

**Section 20.     Governing Law; Venue; Waiver of Jury Trial.**     This Agreement, and any claim, controversy or dispute arising under or related to this Agreement, will be governed by, and its terms and conditions will be construed, interpreted and enforced in accordance with, the laws of the State of New York without regard to conflict of law principles. Each Party hereby consents and agrees that the courts of the State of New York located in Westchester County, New York or the United States District Court for the Southern District of New York are the exclusive forums for litigation of any claim or counterclaim by the Parties arising under this Agreement.     EACH PARTY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT.

**Section 21.     Severability.** If any provision of this Agreement is be determined by a court of competent jurisdiction to be invalid or unenforceable, such provision, to such extent it is so determined to be invalid or unenforceable, will be reformed without further action by the Parties to the extent necessary to make the provision valid and enforceable and no other provision of this Agreement will be affected or impaired thereby, unless such reformation would result in such a material change so as to cause performance of the obligations of the Parties under this Agreement to be unreasonable.

**Section 22.     Counterparts.** This Agreement may be executed by the Parties in any number of counterparts, including, without limitation, by facsimile transmission or by transmission of a .PDF or other similar file via e-mail, each of which will be deemed to be an original, including, without limitation, those sent by facsimile transmission or by transmission of a .PDF or other similar file via e-mail, but all such counterparts will together constitute one and the same instrument.

**Section 23. Exclusivity and Non-Solicitation of Third Party Partners by Client.** The Services or Deliverables contained in this Agreement or underlying SOW are provided by Company on a non-exclusive basis by Company. This Agreement does however confer non-solicitation obligation upon Client in respect of third parties.     Client recognizes that the Company has proprietary relationships with third party partners such as, but not limited to, lead aggregation vendors, brokers, and other third parties that supply and purchase leads Company ("Third Party Partners"). Client agrees not to knowingly circumvent Company's relationship with such Third-Party Partners during the term of this Agreement and for one (1) year following termination or expiration of this Agreement. Company may make certain exceptions, from to time, at its discretion to this Section. Such exceptions shall be made without prejudice to this Section. Client agrees that monetary damages for its breach, or threatened breach, of this Section will not be adequate and that Company shall also be entitled to: (a) injunctive relief (including temporary and preliminary relief); (b) liquidated damages from Client in the amount equal to one hundred percent (100%) of the Fees that would have been received by Company and/or (c) any and all other remedies available to Company at law or in equity.

IN WITNESS WHEREOF, the Parties have duly executed this Agreement on the date first written above.

**DeMayo Law Offices, L.L.P.**

By: Michael A. DeMayo (Jan 25, 2022 14:58 EST)

Name:  Michael A. DeMayo

Title:  CEO

<u>Notice Information</u>:

1211 E Morehead St
Charlotte
NC 28204

**LACUNA VENTURES, LLC**

By:

Sid Toama

Chief Operation Officer

<u>Notice Information</u>:

2 Depot Plaza, Suite 402, Bedford Hills
New York 10507
Attention:  Sid Toama

# DeMayo Lacuna MSA 2022

Final Audit Report

2022-01-25

| | |
|---|---|
| Created: | 2022-01-24 |
| By: | Sid Toama (sidt@convergedirect.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAKWD3Qwop5fNzCmSB4MQYzm9Zbv7qYDql |

## "DeMayo Lacuna MSA 2022" History

📄 Document created by Sid Toama (sidt@convergedirect.com)
2022-01-24 - 6:15:20 PM GMT- IP address: 108.6.180.21

📧 Document emailed to Michael A. DeMayo (michael@demayolaw.com) for signature
2022-01-24 - 6:15:50 PM GMT

📄 Email viewed by Michael A. DeMayo (michael@demayolaw.com)
2022-01-25 - 1:11:18 PM GMT- IP address: 104.28.32.226

✍️ Document e-signed by Michael A. DeMayo (michael@demayolaw.com)
Signature Date: 2022-01-25 - 7:58:36 PM GMT - Time Source: server- IP address: 216.136.72.195

✅ Agreement completed.
2022-01-25 - 7:58:36 PM GMT

**Adobe Sign**